Mrs. Virginia **BARNETT** et al., Appellants,

v.

**M & G GAS COMPANY, William and Beulah Barnett, and Exxon Chemical Company, Respondents.**

No. 41875.

Missouri Court of Appeals, Eastern District, Division Two.

Jan. 6, 1981.

Lawrence O. Willbrand, St. Louis, for appellants.

Edward K. Fehlig, Clayton, Samuel T. Vandover, Ralph C. Kleinschmidt, St. Louis, for respondents.

PUDLOWSKI, Presiding Judge.

Plaintiffs appeal from the judgment rendered in a wrongful death action brought by the widow and six minor children of the deceased, Taft Barnett. Suit was instituted against M & G Gas Co. (hereinafter referred to as M & G), Exxon Chemical Co. (hereinafter referred to as Exxon) and William and Beulah Barnett, the deceased's parents. The cause of action arose out of an explosion and fire at William and Beulah's summer residence in Fredericktown, Missouri in May, 1975. Taft Barnett was fatally injured. The widow's brother, Raymond Purcell, also sustained injuries due to the explosion and joined the action as a plaintiff. Plaintiffs and defendants dispute vigorously the cause of the explosion and fire which resulted in the injuries above. Plaintiffs attribute it to an LP gas leak. Defendants presented evidence that the explosion was caused by the accumulation of gasoline vapors.

At the close of plaintiffs' evidence, the trial court directed a verdict in favor of William and Beulah Barnett. Further, it directed a verdict in favor of M & G and Exxon following the close of all the evidence. Plaintiffs' first three points on appeal alleged that the trial court erred in so directing the verdicts in favor of the defendants since the plaintiffs contend they had made a prima facie case against each defendant for their particular acts of negligence. We do not agree.

■ We initially note that a directed verdict is a drastic measure. In passing upon the propriety of such a motion, we must apply the fundamental and settled rules that we consider all of the evidence in the light most favorable to the plaintiff, accept it as true where it is not entirely unreasonable or opposed to physical laws, accord to plaintiff the benefit of all favorable inferences deducible from the evidence, reject all unfavorable inferences and disregard defendant's evidence except insofar as it aids plaintiff's case. *Joiner v. Kurt's Chip-A-Way Park, Inc.*, 510 S.W.2d 773, 774 (Mo.App.1974); *Cantrell v. Superior Loan Corp.*, 603 S.W.2d 627, 634 (Mo.App.1980). When challenged on appeal, a verdict directed against plaintiff will fall "unless the facts in evidence and the legitimate inferences to be drawn from such facts, are so strongly against the plaintiff as to leave no room for reasonable minds to differ." *Abel v. Campbell 66 Express, Inc.*, 378 S.W.2d 269, 271 (Mo.App.1964); *Braun v. General Motors*, 579 S.W.2d 766, 769 (Mo.App.1979).

Viewed in this light plaintiffs' evidence established that William and Beulah Barnett were the owners of a small 5 room house in Fredericktown, Missouri with overall dimensions of 30 × 15 feet. This house contained a kitchen of approximately 9 × 15, a living room of 12 × 15, a bedroom of 9 × 12 and a small utility room and bathroom. There was no basement, only a

crawl space under the house. The liquid petroleum (LP) tanks used for heating and cooking were located 30 feet north of the kitchen. The Fredericktown house was a second or vacation residence for William and Beulah. Thus, it was periodically occupied on weekends and frequently used during the summer months. One week prior to the explosion and fire on May 4, 1975, William and Beulah, along with the deceased and two of his children, had been to the house and had used the stove. At that time, there was no indication of any LP gas leakage or any problem with the LP gas appliances. The pilot light on the top burners of the stove had been turned off with a screwdriver so that the burners could only be ignited with a match. The gas line to the space heater was turned off.

Plaintiff, Raymond Purcell, testified that he met the deceased, Taft Barnett,[1] on May 4, 1975 at about 4 p. m. at Roy's Corral, a tavern in north St. Louis County. Taft and Purcell were friendly as Taft was married to Purcell's sister. After consuming a few beers Taft Barnett convinced Purcell to drive him to the house in Fredericktown. The men ordered a six pack for the road and left for Fredericktown. They each had a couple of beers[2] during the drive to Fredericktown. When they arrived, Purcell, who was ready to return immediately to St. Louis, was concerned that he did not have enough gasoline in his automobile for the return trip. Taft told Purcell that there was a full five gallon container of gasoline in the barn. The can was filled to the brim and when Purcell tried to walk with it, the gasoline splashed onto his legs, soaking his pants, shoes and socks. Realizing that he needed a funnel to pour the gasoline into the car, Purcell went into the house and sought Taft's assistance in procuring one.

Unable to find a funnel, Purcell returned to the car with the gas can and again spilled gasoline on himself as he tried to pour gas into the tank. Upon emptying the gas can of about half of its contents Purcell returned to the house, set the can inside the kitchen door and was prepared to leave for St. Louis. Purcell spoke briefly with Taft who had set a pot on the stove and was preparing dinner, although the stove was not yet lit. No more than 15 minutes had transpired since they had arrived. As he turned to leave the house, Purcell saw Taft raise his hand to light a cigarette. A tremendous explosion ensued and the house became inflamed. Purcell was thrown out of the house with his clothing on fire. As a result, Purcell was burned over 90% of his body and Taft was killed. The house was entirely destroyed.[3] At 6:55 p. m. Daryl Asher, Chief of the Fredericktown Volunteer Fire Department, arrived on the scene of the explosion and fire. The west wall of the house was completely removed from the building with the curtains intact. Glass fragments unmarked from heat or smoke were found 50 to 60 feet away from the building and unburnt splinters were found 40 feet away. The kitchen gas range as well as the space heater were intact with no evidence of any internal damage, although both were burned on the outside and had sustained some exterior damage due to falling debris.

The Barnetts had experienced problems with their 500 gallon LP gas tank the previous summer. Normally the Barnetts only required 200 gallons of LP gas during the course of an entire year. However, on March 11, 1974, M & G had delivered 200 gallons of LP gas to the Barnetts. On June 18, 1974 another 200 gallons was delivered and by August 24, 1974[4] the tank was

---

1. Also called Udell and Dale throughout the transcript.

2. This indeed presents plaintiffs' evidence in a most favorable light as defendants introduced the autopsy report establishing that deceased's body had .16 ethyl and .16 methyl alcohol for a total of .32 blood alcohol content.

3. A review of photographs taken the day following the explosion and introduced into evidence by defendants reveals only some cinder blocks, the LP gas piping, the kitchen stove and space heater still intact.

4. There is some confusion in the record as to whether it was August 24th or 27th, however, the discrepancy is not important for our review.

empty. Thus, in a period of five months, from March to August, the Barnetts had used 400 gallons. This situation did not go unnoticed. On August 5, 1974, Mr. Barnett reported a leak in the 500 gallon tank to M & G. Thomas Miller, M & G's representative, made a service call to the Barnetts on August 24. A leak was found at the bottom of the 500 gallon tank. For that reason the empty 500 gallon tank was disconnected and replaced with a 100 lb cylinder holding only 24 gallons of LP gas. However, the 500 gallon tank was left in the Barnetts' yard. Miller did not perform a monometer test to determine the presence of leaks in the piping system. Miller felt this test was not required because he had found the source of the problem.

On the day following the explosion the disconnected 500 gallon tank was still on Barnetts' property. The 100 lb cylinder was half empty. Thus, only 12 gallons of LP gas had been used between August 24, 1974 and May 5, 1975.

To make a submissible case against any of the defendants, plaintiffs had the burden to establish a LP gas explosion. Plaintiffs' theory is that the LP gas leak, which was evident in August, 1974, was not repaired but was progressive and apparent when the appliances were being used. Plaintiffs contend this explains the loss of the 12 gallons of LP gas released from the 100 lb cylinder. They continue by alleging that the escaping LP gas accumulated under the house and reached the critical mixture of air and propane necessary for an explosion when the deceased, Taft, lit his cigarette. Plaintiffs also insist that the can of gasoline brought into the house by Purcell was knocked over by the force of the explosion, spilling its contents and fueling the fire which consumed the structure.

However, plaintiffs' evidence totally fails to establish their contention that there was an LP gas leak and a LP gas explosion. Plaintiffs rely on the presumption that proof of the existence, at a particular time, of a fact of a continuous nature gives rise to an inference, within logical limits, that it exists at a subsequent time.

Plaintiff cites *Missouri Power & Light Co. v. City of Bucklin*, 349 Mo. 789, 163 S.W.2d 561, 564 (Mo.1942) as support for this proposition. There is no question this is the law. However, this presumption exists only until evidence to the contrary is shown. *Missouri Power & Light Co. v. City of Bucklin*, 163 S.W.2d at 564. Plaintiffs' own evidence rebuts the presumption that the leak was a continuing one after August, 1974. Plaintiffs established that the LP gas leak which was evident during the spring and summer of 1974 was corrected. Plaintiffs also showed that 400 gallons of LP gas escaped in a five month period prior to correcting the LP gas leak. Only 12 gallons were used in the next nine months, a rate well within the normal amount which the Barnetts consumed. Plaintiffs attempted to circumvent this evidence by charging that the LP gas leak developed upon use of the appliances. However, there was simply no evidence of an LP gas leak other than the one in the 500 gallon tank. William and Beulah Barnett testified that the range had been used the previous weekend with no problems. Plaintiffs presented no evidence which established a leak in the LP gas pipeline or in the 100 lb cylinder tank before or after the explosion. Further, there was no internal damage to either the range or the heater. This further discredits plaintiffs' theory that the appliances were the cause of the explosion. The bulk of plaintiffs' evidence presented to establish that the gas appliances were the source of a LP gas leak was the testimony of Tonya and Robin Barnett, aged 10 and 11. Tonya and Robin are grandchildren of William and Beulah. The two children testified that the stove went "poof" when it was lit. However, there was nothing in the record to indicate that this was anything more than the normal sound a gas appliance makes when lit. Even plaintiffs' own expert witness, Dr. Sutera, did not indicate any possible sources of LP gas leaks. Dr. Sutera did not personally inspect the Barnett premises, pipes or appliances. Further, he neither gave an opinion as to the source of any LP gas leaks on the premises nor did he give testimony that the explosion in this case was caused or

could have been caused by LP gas. Plaintiff Purcell testified that he smelled no LP gas. In sum, the trial court was left to speculate that this was an LP gas explosion. The court below committed no error as it was manifestly prohibited by the law to indulge in such speculation, *Niswander v. Kansas City Gas. Co.*, 181 S.W.2d 165, 167–168 (Mo.App.1944) and properly directed a verdict in favor of all the defendants.

Plaintiffs' final point is that the trial court erred in refusing to allow plaintiffs to dismiss their case at the close of all the evidence pursuant to Supreme Court Rule 67.01. Rule 67.01 provides that a court shall grant leave to so dismiss when justice requires. We believe this case is controlled by *Braun v. General Motors*, 579 S.W.2d 766 (Mo.App.1979) from which we quote as follows:

> In the instant case, we believe the trial court could and did properly rule, in effect, that justice did not require the granting of leave to plaintiff to take a voluntary nonsuit. It is obvious from the wording of Rule 67.01 that the Supreme Court intended that a trial court have discretion in this regard. We cannot hold that discretion to have been abused where, after a three-and-one-half-day trial, during which plaintiff obviously had the opportunity to present all of the admissible evidence available to him, leave to dismiss without prejudice was denied. There are here present no circumstances which militate against our deferring to the exercise by the trial court of its discretion: plaintiff had not suffered the unexpected unavailability of a witness; there is no indication that any witness testified differently than had been expected; nor is there any indication in the record that, upon retrial plaintiff could produce evidence sufficient to make a submissible case. Plaintiff's counsel moved for a dismissal after stating his belief, on the record, that defendant's motion for a directed verdict would be sustained. Counsel's effort was a desperate, though unavailing, effort to avoid the consequences of inadequate proof. However circumscribed the trial court's

discretion in denying such a motion may be, cf. *Daniel v. Laclede Gas Company*, 575 S.W.2d 226 (Mo.App.1978), we hold that it was not abused in this case. *Braun v. General Motors*, 579 S.W.2d at 771.

 We note that plaintiffs' motion in the instant cause was made on the sixth day of trial, at the close of all the evidence. The record reveals that the motion was also made as a last resort to avoid a directed verdict. As in *Braun*, this court is not presented with circumstances which counter our well placed deference to the trial court's ruling. We find no abuse of trial court discretion.

Affirmed.

WEIER and GUNN, JJ., concur.